UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

───────────────────────────────

PATTI BECK,

            Plaintiff,

   -vs-

CAROLYN W. COLVIN, Commissioner of
Social Security,

            Defendant.

**DECISION and ORDER
No. 6:13-CV-6014(MAT)**

───────────────────────────────

## I.   Introduction

Plaintiff Patti Beck ("Plaintiff"), represented by counsel, brings this action pursuant to Title XVI of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Social Security Insurance ("SSI"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

Plaintiff protectively filed an application for SSI benefits on October 6, 2010, alleging an onset date of disability of May 15,

---

[1]    Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

2010, as the result of Major Depressive Disorder, Social Phobia, and Panic Disorder with Agoraphobia. T.125-30.[2] The claim was denied on December 24, 2010, T.48-51, and Plaintiff sought an administrative hearing. Plaintiff appeared with counsel before administrative law judge Lawrence Levey ("the ALJ"). See T.7-31. The ALJ denied Plaintiff's claim on November 9, 2010. T.33-43. The Appeals Council denied Plaintiff's request for review on November 14, 2012, making the ALJ's decision the final decision of the Commissioner. T.1-4. This action followed.

III. **Summary of the Administrative Record**

    A.   **Personal and Vocational History**

Plaintiff was 49-years-old on the date of the hearing. She has a high school education and has not worked since September 30, 2010. Her last job was on a part-time basis at the Finger Lakes Times mail room T.12.  Prior to moving from Michigan to New York, she worked as an animal caretaker at a veterinarian's office on a full-time basis for about two years. T.13. Plaintiff testified that she is currently unable to work because she cannot handle the stress of it mentally, and often becomes suicidal and depressed. She experiences severe depression eight to nine times per month T.15. She has difficulty concentrating; sleep disturbances (either sleeping too much or too little), decreased energy, and crying

---

[2]     Numerals preceded by "T." refer to pages in the transcript of the administrative transcript, submitted as a separately-bound exhibit by Defendant.

spells. T.17. At the time of the hearing, Plaintiff was currently public assistance benefits and was exempt from having to work. T.18. Prior to filing her SSI claim, Plaintiff worked part-time (about 20 hours per week) cleaning houses, but even this was difficult for her to do. T.21.

### B.    Medical Records Prior to the Onset Date

Plaintiff began treating with psychiatrist Kang Yu, M.D. at the Seneca County Community Counseling Center in October of 2002. T.286. However, the first treatment note from Dr. Yu in the administrative record is dated December 1, 2008. At that time, Dr. Yu noted that Plaintiff was taking paroxetine (Paxil), 60mg per day and clonazepam (Klonopin) 1 mg, 3 times per day. With this medication regime, her depression and "have been under good control." T.225. Plaintiff's affect was "very broad with pleasant mood." Id. She had been doing some work house-cleaning. Dr. Yu noted that her  depression, social anxiety and panic attacks had been minimally severe. T.225.

On March 2, 2009, Plaintiff returned to see Dr. Yu, who again noted that her current medication regime of Paxil and Klonopin, her depression and "have been under good control." T.225. Plaintiff's affect was "very broad with pleasant mood." Id. She was still house-sitting for a disabled man in Stanley and had additional house-cleaning customers in Seneca Falls. Id.

On June 1, 2009, Plaintiff returned to see Dr. Yu and reported that she was still working as a house-cleaner. T.226. Dr. Yu noted that she was a "rapid metabolizer" of Paxil in that she excreted it much faster than other patients, so he increased her dosage slightly. Id. He noted that her affect was "very broad with pleasant mood." Id.

On September 1, 2009, Plaintiff reported to Dr. Yu that she felt as though she was doing "very well in her psychiatric condition and just want[ed] more work so that she can pay all the bills which are due." T.226. Currently, she was make the minimum amount needed to pay for rent, food, and clothing. Dr. Yu kept her medication regime the same as her anxiety and depression had been under good control. Id.

On December 1, 2009, Dr. Yu noted that Plaintiff "continues to have some depression" and recently had lost interest in working. T.226. She informed that Dr. Yu that as wintertime approaches, she experiences decreased energy, enthusiasm, and motivation. Her landlord had received a foreclosure notice, so Plaintiff faced becoming homeless. Plaintiff was seeking help through Lakeview to obtain housing. Dr. Yu noted that her affect was slightly constricted (i.e., she had a reduced range and intensity of emotional expression), with a mildly depressed and apprehensive mood. T.226.

On March 2, 2010, Plaintiff returned to see Dr. Yu. She was still on the same regime of Paxil and Klonopin, which, according to Dr. Yu, had been keeping her depression and anxiety "under good control." T.227. Plaintiff's affect was "very broad with pleasant mood." Id. Plaintiff was planning to move back to the Geneva area, as the disabled man for whom she had been working as a housekeeper had told her to move out because he no longer needed help. Id.

### C.   Medical Records After the Onset Date

#### 1.   Treatment Notes and Evaluation of Treating Psychiatrist Dr. Yu

On June 3, 2010, Plaintiff reported an increase in anxiety and depression because she had run out of clonazepam several days before the appointment. T.227. She said that without the clonazepam, she was having much worse anxiety and panic attacks. Id. Her medication regime was kept the same, and she was instructed to return in three months. T.227.

On September 2, 2010, Dr. Yu noted that with her current medication regime, her depression has been under good control and she was not having much anxiety. T.228. She had moved to Seneca County and was living at a hotel. She had begun receiving Medicaid and food stamps. The Seneca County Workforce Development Center had told her that she should not work.[3] Dr. Yu commented, "[E]ven

------

[3] There are no records from the Seneca County Workforce Development Center in the administrative record.

though she presented herself to be quite capable, . . . . [s]he apparently is more impaired than she presented herself in the past." T.228. Her affect was "fairly broad with pleasant mood." Id. Dr. Yu counseled her to take as little clonazepam as possible as she was on a high dose of paroxetine which should provide good anti-panic effect. Id.

Also on September 2, 2010, Dr. Yu completed an "Updated Psychiatric Evaluation – Seneca County Community Counseling Center," T.287-89. Dr. Yu commented that "her depression seems to be under good control, but her Social Anxiety, Panic Disorder are not under good control." T.287. He stated that she had not been able to work in a competitive employment setting because of her "severe Social Anxiety Disorder and Panic Disorder." Id. With regard to her mental status, Dr. Yu noted that her affect was "fairly broad with pleasant mood" although she "continue[d] to have difficulty with panic attacks when she goes to a place where there are many different people, particularly strangers." Id. He noted that intellectual functioning and fund of knowledge were average and that she had "developed good insight into her illness" and her judgment was "considered to be fair at this time." Id. Dr. Yu issued the following diagnoses: Major Depressive Disorder, recurrent, in partial remission; Social Phobia, generalized, in partial remission; Panic Disorder, with agoraphobia, in partial remission; Cannabis Dependence; and Nicotine Dependence. T.287. He

-6-

assigned a current GAF of 65, and noted that her highest GAF in the past year was 65. T.288. Dr. Yu stated that Plaintiff's prognosis was "fair" for her depression but "poor for her to be fully functioning, particularly working with other people." T.288.

On December 2, 2010, Plaintiff returned to see Dr. Yu, who noted that "her panic attacks have been under good control" with her medication regime. T.289. She reported being "still quite anxious" around crowds and strangers, but by avoiding these situations, "she has not felt much anxiety." Id. She had not smoked marijuana for about a month and was cautioned that if she continued to use marijuana, Lakeview might not be able to help her with housing.

On March 3, 2011, Plaintiff reported to Dr. Yu that her depression has "not been under complete remission" and she has been having difficulty falling asleep. T.289. Her affect was fairly broad with pleasant mood. Id. Dr. Yu increased her paroxetine CR. She had been taking only two clonazepam per day, and "her anxiety has been under good remission" with this dosage. Id.

On June 2, 2011, Dr. Yu noted that her depression and anxiety "have been under good control" with her current medication regimen. T.290. Her affect was "very broad with pleasant mood." Id. Although she "still has anxiety from time to time," she has been able to take the bus. Id. Even though she was able to do some house-cleaning work, she "does not want to get into trouble with DSS,

because if she is found to be working, DSS may sanction her benefit." Id.

Plaintiff saw Dr. Yu on September 1, 2011. She continued to take her medications and had her depression under fair control. She noted that she was "not having much anxiety symptoms." T.293. However, she still was having "difficulty being engaged in full-time employment due to her panic attacks and social phobia." Id. She was able to take the bus to attend her appointments and had not been smoking marijuana. Id. She was "getting by" on three clonazepam per day for her anxiety. Id.

**b.    Dr. Yu's Medical Source Statement**

On August 16, 2011, Dr. Yu completed the SSA form titled, "Evaluation Of The Residual Functional Capacity Of The Mentally Impaired Patient". T.282-86. Dr. Yu rated Plaintiff's ability to understand and remember as "good", explaining that she is able to carry out simple instructions "as long as her depression is stable." T.282. Her "ability to remember work procedures is limited due to low threshold of tollerance [sic] to mediate stressors." Id. With regard to social interactions with supervisors and co-workers, Dr. Yu noted that Plaintiff has "difficulty managing her distrubance [sic] emotional state, particularly when placed under stress." T.283. Dr. Yu stated that her ability to regulate her affect is "limited and can result in [Plaintiff] engaging in aggressive behavior." Id. As the result of Plaintiff's chronic

-8-

mental health issues, Dr. Yu opined that she has a limited ability to negotiate for her needs in a healthy manner. T.283. Dr. Yu noted that she functions better when she works independently, since she is not as "reactive" when not under direct supervision. T.283. Dr. Yu rated her ability to complete a normal workday on a sustained basis as "poor" "[d]ue to her severe anxiety, depression and limited capacity to negotiate for her needs in a healthy, productive manner." Id. He assessed her ability to exercise appropriate judgment as "limited" when her anxiety and depression symptoms "are particularly active." Id. Her ability to concentrate and attend to a task over an 8-hour day is "poor" due to lack of concentration, [lack of] focus, lack of motivation, [lack of] energy and unstable mood." T.283. Dr. Yu assessed Plaintiff's ability to abide by occupational rules and regulations as "fair", but noted that this ability is "particularly limited when her anxiety and depressive symptoms are active." T.285. Her ability to maintain social functioning was rated as "fair", with Dr. Yu commenting that she has a "difficult time regulating her emotions." T.285. Dr. Yu opined that her ability to tolerate customary work pressures, including production requirements and demands, is "poor". Id. Dr. Yu noted that when she is under stress, Plaintiff's depression and anxiety "can be activated" and she "can be placed at risk for decompensation" and possibly self-harm. Id.

-9-

When asked whether Plaintiff's condition is likely to deteriorate if she is placed under stress, especially that of a job, Dr. Yu responded "yes" and reiterated her low threshold for tolerating stress. T.285. Dr. Yu noted that this deterioration has occurred in the past, and Plaintiff "has lost many jobs due to relapse of psychiatric symptoms." Id. He noted that the last time decompensation leading to the loss of a job had occurred in May 2010, T.286, which coincides with Plaintiff's one-month stint as a mailroom clerk at the Fingerlakes Times.

Dr. Yu issued the following diagnoses: Major Depressive Disorder, recurrent, in partial remission; Social Phobia, generalized, in partial remission ; Panic Disorder, with agoraphobia; Cannabis Dependence; and Nicotine Dependence. T.286. Dr. Yu opined that Plaintiff is likely to be absent from work more than 4 days per month due to her mental impairments, and "should not be working more than 4 hours per day, 3-4 days per week." Id.

### 2. Consultative Psychologist Dr. Zastowny (11/08/10)

On November 8, 2010, Plaintiff was evaluated by consultative psychologist Thomas Zastowny, Ph.D. at the request of the Administration. See T.231-36. According to Dr. Zastowny, her current psychiatric functioning was "limited, but stable." T.231 She reported "variable depression, panic attacks, [and] posttraumatic stress features associated with a history of sexual abuse." T.231-32. She commented, "[A]nxiety and lack of interest in

doing things are my problem." T.232. Plaintiff also reported problems with sleep and some cognitive functioning difficulties, particularly with memory, organizational errors and holding a stream of thought in a conversation. T.232. She denied any "frank suicidal ideation or psychotic features." Id.

With regard to her mental status examination, Dr. Zastowny indicated that her "demeanor and responsiveness to questions was generally cooperative" and her "manner of relating, social skills, and overall presentation was adequate." T.232. Her thought processes were "[g]enerally intact" and information processing "appeared to be within normal limits" albeit with "instances of tangential stories of her childhood and life experience without any point of relevancy to the current interview." T.233.

Dr. Zastowny noted that her mood was "[s]omehwat sad, but pleasant, appropriate to the circumstance and situation of the interview." T.233. Her attention and concentration were "[s]omewhat limited" and she had "some difficulty with serial 3's, three steps." Id. Her immediate, recent, and remote memory skills were "slightly impaired[,] perhaps secondary to attention and concentration [sic] and mild anxiety." Id.

With regard to her cognitive functioning, Dr. Zastowny noted that it was "adequate" with "[s]ome positive attributes noted for knowledge of veterinary medicine." T.234. Her level of consciousness "was quite intact." Id. Her insight, however, was

"[l]imited and "somewhat superficial", and her judgement was "[g]auged as limited currently affected by current stress level." Id.

For his Medical Source Statement, Dr. Zastowny opined that Plaintiff "can follow simple directions and perform simple tasks" although "attention and concentration appeared limited." T.234. She was "able to maintain a daily schedule, mostly self care activities, but otherwise, [she was] somewhat sedentary and restricted." Id. Dr. Zastowny wrote,

> Her ability to handle stress appears moderately impaired. Her judgment and decision making are also quite limited. Her difficulties and current status are likely related to her longstanding lack of functional employment and significant psychiatric symptoms.

T.234. Vocationally, Dr. Zastowny stated, Plaintiff "appear[ed] able to follow, understand, and remember simple instructions and directions" and "appear[ed] to be capable of performing some simple and more complex tasks with supervision and independently." T.234-35. Dr. Zastowny concluded that the results of his evaluation were "somewhat consistent with cognitive and psychiatric problems, impaired function and social status, and may or may not affect her basic ability to function on a day-to-day level." T.235. He issued a diagnosis of Anxiety Disorder, Not Otherwise Specified, and opined that her prognosis was "guarded to limited [sic]". T.235. Dr. Zastown recommended a "full functional capacity evaluation to assess her functional profile and capabilities", as well as an

increase in treatment frequency in order to raise her functioning. <u>Id.</u>

### 3.   Consultative Physician Dr. Toor (11/08/10)

Also on November 8, 2010, Plaintiff underwent a physical examination by consultative physician Harbinder  Toor, M.D. Dr. Toor noted that her physical examination was normal without any evidence of physical limitations. T.237-40.

### 4.   Primary Care Physician Dr. Olsowska (11/09/10-02/25/11)

On November 9, 2010, Plaintiff saw Agata Olszowska, M.D. in order to establish care and to discuss the headaches that she was having. T.262. Plaintiff reported that she was seeing Dr. Yu for her continuing anxiety and depression. She also complained of almost daily headaches, which occurred year-round but were worse in the winter. T.263. She was given medications for smoking cessation and allergic rhinitis. T.264. Dr. Olszowska referred Plaintiff to Seneca County Community Counseling Center for depression on February 25, 2011. T.278.

## III. Standard of Review

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine <u>de novo</u> whether a claimant is disabled, <u>Pratts v. Chater</u>, 94 F.3d 34, 37

(2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

This Court must independently determine if the Commissioner applied the correct legal standards in determining that the claimant is not disabled. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). "Failure to apply the correct legal standards is grounds for reversal." Id. Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and then, if the standards were correctly applied, then considers the substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   Eligibility for Supplemental Security Income

To establish disability under the Act, a claimant bears the burden of demonstrating (1) that she has been unable to engage in substantial gainful activity by reason of a physical or mental

impairment that has lasted or could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment has been demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

To determine disability, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. § 416.920; see also Williams v. Apfel, 204 F.3d 48, 48-49 (2d Cir. 1999). The burden of proof is on the claimant at the first four steps of the evaluation. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant establishes that she is unable to perform any of her past relevant work, there is a limited burden shift at the fifth step to the Commissioner, who must determine whether the claimant is capable of performing other work that exists in significant numbers in the national economy. 20 C.F.R. § 416.920; see also Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). In making his decision, the ALJ must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quotation omitted).

**VI.  The ALJ's Decision**

The ALJ applied the five-step sequential evaluation and, at step one, found that Plaintiff had not engaged in substantial gainful activity since September 1, 2010, the application date. T.38. At step two, the ALJ determined that Plaintiff had the following severe combination of impairments: depressive disorder and anxiety disorder. Id. He noted that the impairments were "cumulatively severe because they cause more than minimal limitations on her ability to undertake basic work activities." Id. With regard to her chronic bronchitis, the ALJ noted that there was no evidence to suggest that it causes more than minimal limitations on her ability to undertake basic work activities. Id.

At the third step, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Par 404, Subpart P, Appendix 1 (20 C.F.R. 416.920(d), 416.925, 416.926), namely Listing 12.04 (Affective Disorders) and 12.06 (Anxiety Disorders). T.38-39. As required, the ALJ applied the special psychiatric review technique ("PRT"), see T.39-40, rating the degree of functional limitation resulting from Plaintiff's mental impairments in regards to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. See 20 C.F.R. § 416.920a(b), (c).

At step four, the ALJ found that Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, with the following nonexertional limitations: she is limited to performing simple, routine, and repetitive tasks, in a work environment free of fast-paced production requirements. T.40. The position must require only simple work-related decisions, with few, if any, changes in the workplace. Id. In addition, Plaintiff requires a job that involves working primarily with objections rather than people, and does not involve interaction with the general public or more than occasional interaction with co-workers and supervisors. Id. The ALJ relied on the vocational expert's testimony that, in light of her nonexertional limitations, Plaintiff is unable to perform her past relevant work as a newspaper worker (DOT 292.474-010) and veterinary assistant (DOT 079.361-014).

At step five, the ALJ determined, based on the vocational expert's testimony presented at the hearing, that there were jobs that exist in significant numbers in the national economy that Plaintiff, a younger individual with a high school education, could perform with her RFC. See T.42-43.

**VII. Discussion**

    **A.  Erroneous Step-Two Severity Determination**

At step two of the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment that

-17-

significantly limits her physical or mental ability to do basic work activities. See 20 C.F.R. § 416.920(c). "Work activities" refer to "abilities and aptitudes necessary to do most jobs[,]" including various physical functions; "[u]nderstanding, carrying out, and remembering simple instructions;" "[u]se of judgment;" "[r]esponding appropriately to supervision, co-workers and usual work situations;" and "[d]ealing with changes in a routine work setting." 20 C.F.R. § 416.921(b). Although the Second Circuit has held that the function of the step two determination is simply to "screen out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir. 1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe." Coleman v. Shalala, 895 F. Supp. 50, 53 (S.D.N.Y. 1995) (citations omitted).

Plaintiff argues that the ALJ erred by not considering her diagnosed Social Phobia and Panic Disorder with Agoraphobia as "severe" impairments at step two. Plaintiff notes that apart from his acknowledgment that these diagnoses exist, the ALJ undertook no discussion of these additional impairments. Plaintiff's Memorandum at 8 (citing Burgin v. Astrue, 348 F. App'x 646 (2d Cir. 2009) (unpublished opn.)).

In Burgin, the ALJ noted that the claimant suffered from major depression and bipolar disorder, but listed only bipolar disorder

-18-

in the claimant's combined list of impairments when determining her RFC. The Second Circuit was "unpersuaded by the Commissioner's argument that the ALJ's consideration of Burgin's bipolar disorder encompassed her depression-related symptoms, because the medical evidence in the administrative record shows that Burgin's major depression and bipolar disorder were considered professionally as separate diagnoses, and because the ALJ's decision includes no such finding." Id. Thus, the Second Circuit concluded, the ALJ failed to include Burgin's major depression among her combination of impairments and did not meaningfully consider how her combined mental disorders affected her functioning.  Here, Plaintiff has been diagnosed with several anxiety disorders: her general anxiety disorder, social phobia, and panic disorder with agoraphobia represent separately diagnosed psychopathologies.[4] The National Institute of Mental Health's website explains that panic disorder, obsessive-compulsive disorder,  post-traumatic stress disorder, social phobia (or social anxiety disorder), specific phobias (such as agoraphobia), and  generalized anxiety disorder are all classified as anxiety disorders but each one has different symptoms.[5] Although the symptoms of each diagnosis cluster around

---

[4]
http://www.nimh.nih.gov/health/publications/anxiety-disorders/index.shtml
(last accessed May 4, 2014).

[5]
http://www.nimh.nih.gov/health/publications/anxiety-disorders/index.shtml
(last accessed May 4, 2014).

-19-

excessive and irrational feelings of fear and dread, they are separate diagnoses. The ALJ, however, determined Plaintiff's multiple anxiety-diagnoses as a single impairment which he labeled, "anxiety disorder". Thus, it appears that the ALJ failed to recognize that Plaintiff suffers from multiple anxiety disorders having different symptoms, and thereby failed to meaningfully consider the combined, impairing effects of Plaintiff's separate diagnoses. Furthermore, the error was not harmless. See Burgin, 348 F. App'x at 648-49 (remanding for a new step two severity analysis that should include all of plaintiff's diagnosed mental impairments); see also Hernandez v. Astrue, 814 F. Supp.2d 168, 185 (E.D.N.Y. 2011) ("[T]he ALJ failed to meaningfully consider the combination of plaintiff's separate diagnoses of depression, bipolar disorder, anxiety, and alcohol abuse. Thus, when determining whether plaintiff has a 'severe impairment' under step two of the regulations, the ALJ found that plaintiff's severe impairments included only 'depression and substance abuse disorder.' Further, notwithstanding the ALJ's bare acknowledgment of plaintiff's bipolar disorder and anxiety diagnoses during step three of the analysis, there is no indication that the ALJ accounted for or meaningfully considered plaintiff's separate additional diagnoses of anxiety or bipolar disorder during the entirety of the five-step sequential analysis as required by the regulations.") (internal quotations to record omitted).

**B.   Erroneous Rejection of the Treating Psychiatrist's Opinion**

**1.   Applicable Legal Principles**

"Regardless of its source," the regulations require that "every medical opinion" in the administrative record be evaluated when determining whether a claimant is disabled under the Act. 20 C.F.R. § 416.927(d). "Acceptable medical sources" that can provide evidence to establish an impairment include, <u>inter</u> <u>alia</u>, a claimant's treating physicians, psychiatrists, and psychologists. 20 C.F.R. § 416.913(a). In addition, the SSA may rely on "other sources" to provide evidence of "the severity of [a claimant's] impairment." 20 C.F.R. § 416.913(d). In certain cases the SSA will pay for a qualified consultative physician to provide a physical or mental examination of a claimant. 20 C.F.R. § 404.917; <u>see</u> <u>also</u> 20 C.F.R. §§ 404.919; 404.919g.

The medical opinion of a claimant's treating physician or psychiatrist will be given "controlling" weight if that opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." 20 C.F.R. § 416.927(d)(2); <u>see</u> <u>also</u> <u>Green-Younger v. Barnhart</u>, 335 F.3d 99, 106 (2d Cir. 2003). Medically acceptable clinical and laboratory diagnostic techniques include consideration of a "patient's report of complaints, or history, [a]s an essential diagnostic tool." 335 F.3d at 107. The rationale for according well-supported treating

physicians' opinions controlling weight is that they "[a]re likely to be [from] the medical professionals most able to provide a detailed [and] longitudinal picture of [the claimant's] medical impairment(s). . . ." 20 C.F.R. § 416.927(d)(2). "In contrast, in evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight." Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) (citing Bluvband v. Heckler, 730 F.2d 886, 894 (2d Cir. 1984) (ALJ should not baldly accept consulting physicians' evaluations which are disputed and formulated after they had examined claimant only once)). This is because "consultative exams are often brief, are generally performed without the benefit or review of claimant's medical history and, at best, only give a glimpse of the claimant on a single day." Cruz, 912 F.2d at 13 (citation omitted).

A corollary to the treating physician rule is the so-called "good reasons rule," which provides that the SSA "will always give good reasons in [its] notice of determination or decision for the weight [it] gives [claimant's] treating source's opinion." Clark, 143 F.3d at 118 (quoting 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2); alterations in Clark). "Those good reasons must be 'supported by the evidence in the case record, and must be sufficiently specific . . . .'" Blakely v. Commissioner of Social Sec., 581 F.3d 399, 406 (6th Cir. 2009) (quoting Social Security Ruling ("SSR") 96-2p, 1996 WL 374188, at *5 (S.S.A. July 2, 1996)).

-22-

Because the "good reasons" rule exists to "ensur[e] that each denied claimant receives fair process," Rogers v. Commissioner of Social Sec., 486 F.3d 234, 243 (6th Cir. 2007), an ALJ's "'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record.'" Blakely, 581 F.3d at 407 (quoting Rogers, 486 F.3d at 243; emphasis in Blakely).

###### 2.  Analysis

Here, the ALJ wrote that Dr. Yu's Medical Source Statement deserved only "limited weight, as it [was] inconsistent with his contemporaneously prepared treatment notes, with his assessment of a GAF score of 65, reflective of no more than mild impairment[-]related limitations, Exhibit 9F, and with the range of the claimant's reported activities." T.42. "It is important to keep in mind that, as a global reference intended to aid in treatment, 'a GAF score does not itself necessarily reveal a particular type of limitation and is not an assessment of a claimant's ability to work.'" Provencio v. Astrue, No. CV 11-141-TUC-BPV, 2012 WL 2344072, at *8 (D. Ariz. June 20, 2012) (quoting Stokes v. Astrue, No. 8:08-cv-1657-T-23HTS, 2009 WL 2216785, at *7 (M.D. Fla. July 23, 2009); citing 65 Fed. Reg. 50,764-50,765 (Aug. 21, 2000) ("The GAF scale . . . is the scale used in the multiaxial

evaluation system endorsed by the American Psychiatric Association. It does not have a direct correlation to the severity requirements in our mental disorders listings.")). To the extent the ALJ rejected the opinion as incompatible with the GAF score, the ALJ failed to explain why a single GAF score, which is a generalized assessment, superseded Dr. Yu's more precise opinion regarding Plaintiff's ability to perform work-related activities. See id.

With regard to the alleged inconsistency with Dr. Yu's "contemporaneous treatment notes", Defendant cites to a number of medical records that predate, by a few years, Plaintiff's onset date of disability (May 5, 2010) and the date of Dr. Yu's first evaluation (September 2, 2010) and his subsequent Medical Source Statement (August 16, 2011). See Defendants' Memorandum at 18-19 (citing T.225-26 (Dr. Yu's notes from December 1, 2008; March 2, 2009; September 1, 2009; December 1, 2009; March 2, 2010). Thus, these are not "contemporaneously prepared" notes.

With regard to the September 2, 2010 evaluation, for instance, there is one "contemporaneously prepared" treatment note-Dr. Yu's September 2, 2010 synopsis of his appointment with Plaintiff on that date. Although the note states that Plaintiff's depression is "under good control" and she is "not having much anxiety" with her current medication regimen, it must be borne in mind that Plaintiff was not routinely placing herself in the situations that triggered her anxiety and panic attacks, i.e., being in places with many

-24-

people, such as she would have to do if she were working. Dr. Yu noted in his evaluation that Plaintiff's anxiety was not under good control (even with her medication) when she was in a place with many different or unfamiliar people; she continued to have difficulty with panic attacks in such situations. T.287. Dr. Yu commented that the Seneca County Work Force Development Center informed her that she should not work because she is "apparently . . . more impaired than she presented herself in the past." T.289.

Even if the ALJ properly discounted Dr. Yu's treating source opinion, the opinions of consultative examiner Dr. Zastowny's, as set forth in his report, are, to say the least, "confusing and conflicted," Plaintiff's Memorandum at 11, and do not constitute "substantial evidence" for a finding of non-disability. For instance, Dr. Zastowny stated that Plaintiff's attention and concentration were limited, T.234, but she nevertheless could maintain attention and concentration, as well as a routine and a schedule, apparently without limitation. T.235. Dr. Zastowny commented that Plaintiff's ability to handle stress "appeared" to be moderately limited, T.234, but she nevertheless "appeared" capable of dealing with stress. T.235. That opinion was qualified yet again by his notation that her coping skills were "modest." Id. Dr. Zastowny found Plaintiff's judgment and decision-making "quite limited", T.234, but he still found that she was capable of making appropriate decisions, T.235, apparently without limitation. He

noted that her "difficulties and current status are likely related to her longstanding lack of functional employment and significant psychiatric symptoms" but then stated that the results of his examination were only "somewhat consistent" with cognitive and psychiatric problems. He subsequently classified her prognosis as "guarded to limited". Dr. Zastowny's repeated use of the term "appeared" illustrates his uncertainty about the extent of the functional limitations caused by Plaintiff's multiple mental impairments. Nowhere is this hedging more apparent then his conclusion, where he states that the results of his evaluation "are *somewhat* consistent with cognitive and psychiatric problems, impaired function and social status and *may or may not* affect her basic ability to function on a day-to-day level." T.235 (emphases supplied). Dr. Zastowny seemingly recognized his inability to give a meaningful opinion regarding Plaintiff's ability to perform work-related activities on a full-time basis, since he recommended a further evaluation, i.e., a "full functional capacity examination to assess her functional profile and capabilities." T.235. The ALJ, however, ignored this portion of Dr. Zastowny's report and, moreover, did not follow Dr. Zastowny's recommendation that a further work-up be performed. See Provencio, 2012 WL 2344072, at *15 ("Because the ALJ did not reject [the consultative examiner]'s opinion, it was error not to include these limitations in the residual functional capacity, as they do describe function and

convey the extent of Plaintiff's mental functional capacity."). Given the tentativeness, internal inconsistencies, and vagueness of Dr. Zastowny's opinion, and the fact that he only saw Plaintiff on one occasion, it cannot provide substantial evidence for the ALJ's opinion. See Burgess v. Astrue, 537 F.3d 117, 128-29 (2d Cir. 2008); Hilsdorf v. Commissioner of Social Sec., 724 F. Supp.2d 330, 347-48 (E.D.N.Y. 2010) (citing Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000), superseded by statute as stated in Poupore v. Astrue, 566 F.3d 303, 306 (2d Cir. 2009)).

## C.   Credibility Assessment

### 1.   Legal Principles

SSR provides that in determining a claimant's credibility, the ALJ "must consider the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." Because "[t]he assessment of a claimant's ability to work will often depend on the credibility of her statements concerning the intensity, persistence and limiting effects of her symptoms[,]" Otero v. Colvin, 12-CV-4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013), it is not logical to decide a claimant's RFC prior to assessing her credibility. Id. To use that RFC to discredit the claimant's subjective complaints

merely compounds the error. Id.; cf. Faherty v. Astrue, No. 11-CV-02476 (DLI), 2013 WL 1290953, at *14 (E.D.N.Y. Mar. 28, 2013) ("The ALJ explained the reason for giving Dr. Tranese's medical source statement significant weight was that it was consistent with her RFC. Such reasoning is circular and flawed. The ALJ should use medical opinions to determine Plaintiff's RFC, and, therefore, cannot give medical opinions weight based on their consistency with the RFC.") (internal citation to record omitted).

### 2.   Analysis

The ALJ here found that although Plaintiff has medically determinable impairments that reasonably could be expected to produce her alleged symptoms, her statements concerning the intensity, persistence, and limiting effects of her limitations are "not credible to the extent they are inconsistent with the above residual functional capacity assessment." T.40-41. The Court has found no support in the regulations or the caselaw from this Circuit supporting the propriety of basing a credibility determination solely upon whether the ALJ deems the claimant's allegations to be congruent with the ALJ's own RFC finding. See, e.g., Smollins v. Astrue, No. 11-CV-424, 2011 WL 3857123, at *11 (E.D.N.Y. Sept. 1, 2011) ("[The ALJ's] analysis of Smollins's credibility is flawed not only in its brevity, but in its acceptance as a foregone conclusion of Smollins's capacity to perform sedentary work. Instead of comparing Smollins's symptoms,

-28-

as described by Smollins herself and her doctors, to the objective medical and other evidence of record as required by the Social Security regulations, [the ALJ] merely compared Smollins's statements regarding her symptoms to his own RFC assessment."); Mantovani v. Astrue, No. 09-CV-3957, 2011 WL 1304148, at *5 (E.D.N.Y. Mar. 31, 2011) (similar). Indeed, the Seventh Circuit has specifically rejected the boilerplate language used by the ALJ in Plaintiff's case, noting that it "implies that ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012).

"If the ALJ decides to reject subjective testimony concerning pain and other symptoms, he must do so explicitly and with sufficient specificity to enable the Court to decide whether there are legitimate reasons for the ALJ's disbelief and whether his determination is supported by substantial evidence." Brandon v. Bowen, 666 F. Supp. 604, 608 (S.D.N.Y. 1987) (citing, inter alia, Valente v. Secretary of Health and Human Servs., 733 F.2d 1037, 1045 (2d Cir. 1984); footnote omitted).

As an additional reason, the ALJ stated that Dr. Kang opined that her "depression, social phobia, and panic disorder were all in partial remission as of March 2011, and subsequently indicated that her panic disorder is in full remission." T.41 (citing Exhibit 11F). The ALJ ignored the portions of Dr. Kang's reports in

which he strongly opines that if Plaintiff were placed in a full-time competitive work-environment, her depression and anxiety symptoms would worsen and she likely would decompensate. The ALJ improperly cherry-picked from Dr. Kang's opinions only the information that purportedly favors a finding of no disability. See Rodriguez v. Astrue, No. 12-CV-4103, 2013 WL 1282363, at *16 (E.D.N.Y. Mar. 28, 2013) ("Given the ALJ's duty to consider Rodriguez's account of her limitations against the background of the full record, and his obligation to develop that record where necessary, the ALJ's selective reading of the evidence was improper.") (citing Fuller v. Astrue, No. 09-CV-6279, 2010 WL 5072112, at *6 (W.D.N.Y. Dec. 6, 2010))

The ALJ also stated that Plaintiff was not credible concerning her limitations because Dr. Kang most recently found her panic disorder to be in full remission. After reviewing the record and the exhibit on which the ALJ relies, the Court finds this statement to be misleading. The ALJ cites Exhibit 11F (T.295-303), which consists of several Form LDSS-4526s (Medical Examination for Employability Assessment, Disability Screening, and Alcoholism/Drug Addiction Determination) completed by Dr. Kang between July 20, 2010, and sometime after March 3, 2011 (the last form is undated). The ALJ relied on the last, undated form, which, admittedly, does indicate that Plaintiff's panic disorder is in full remission. T.302. However, the ALJ neglected to mention that in the same

report, Dr. Kang did *not* indicate that her diagnosed social phobia or major depressive disorder were in any type of remission. T.302. The ALJ also omits any mention of the fact that in Dr. Kang's subsequent medical source statement dated August 16, 2011, he did not indicate that her panic disorder was in any type of remission.

As another reason for finding Plaintiff not credible, the ALJ cited Dr. Kang's assignment of a GAF of 65, which is indicative of "mild symptoms". As discussed above, this was an insufficient basis on which to discount Dr. Kang's specific opinions regarding Plaintiff's limitations, which he supported with detailed comments. Likewise, a single GAF score is an insufficient basis for discounting Plaintiff's own statements about her symptoms. In any event, a GAF reflecting mild symptoms is consistent with Dr. Kang's opinion that Plaintiff's impairments will produce good days and bad days. Provencio, 2012 WL 2344072, at *8.

In addition, the ALJ found Plaintiff "allegedly left her last jobs for reasons unconnected with her disability," T.41 (citing Exhibit 6E, 3F, 10F), but he provides no specifics or pinpoint citations in support. The Court has reviewed the cited exhibits and finds that they are not substantial evidence discrediting Plaintiff's testimony. Exhibit 6E (T.173-80) is a disability questionnaire completed by Plaintiff. Asked if she had ever lost a job because of problems getting along with people, Plaintiff responded "yes" and noted, "My boss and my personalities have

-31-

clashed. . . ." T.180. This is consistent with Dr. Kang's assessment that she has significant limitations in mediating interpersonal relationships in the workplace. Exhibit 3F is Dr. Zastowny's consultative report. Plaintiff reported to him that she had left her job at the Finger Lakes Times in May 2010 "due to lack of transportation." T.231. This raises an issue regarding Plaintiff's degree of candor to Dr. Zastowny, since Dr. Kang's medical source statement indicates that Plaintiff was terminated from a job in May 2010 due to decompensation of her mental status. T.286. Finally, Exhibit 10F is a June 2011 treatment note authored by Dr. Kang in which Plaintiff explained that although she was able to do some house-cleaning work, she stopped because she did not want to run afoul of DSS rules. When asked about this at the hearing, Plaintiff explained, "[T]here was nothing really going on. I'd lost anybody I had. And I couldn't find anybody new. . . . I find that difficult to do a house, anyway. I can't concentrate. I just want to-I don't even want to be there." T.22. Plaintiff also testified that when she was cleaning houses more regularly, she did not work more than 20 to 25 hours a week, and sometimes could not manage to do even that. T.21. In any event, the fact that Plaintiff was able to sporadically work by herself cleaning houses is consistent with Dr. Kang's assessment that she does best without supervision and should not work more than 3-4 hours a day, 3 to 4 days a week.

Finally, the ALJ found Plaintiff to be less than credible due to her "wide range of daily activities". T.41. "[P]erformance of daily activities is not necessarily a clear and convincing reason to discredit a [claimant's] testimony." Provencio v. Astrue, No. CV 11-141-TUC-BPV, 2012 WL 2344072, at *12 (D. Ariz. June 20, 2012) (citing Webb v. Barnhart, 433 F.3d 683, 687-88 (9th Cir. 2005) ("The mere fact that a plaintiff has carried on certain daily activities, such as grocery shopping, driving a car, or limited walking for exercise, does not in any way detract from her credibility as to her overall disability. One does not need to be 'utterly incapacitated' in order to be disabled.") (quoting Vertigan v. Halter, 260 F.3d 1044, 1050 (9th Cir. 2001) (brackets omitted)).

**D.   Remedy**

Under 42 U.S.C. § 405(g), the district court has the power to affirm, modify, or reverse the ALJ's decision with or without remanding for a rehearing. Remand for additional fact development may be appropriate if "there are gaps in the administrative record or the ALJ has applied an improper legal standard." Rosa v. Callahan, 168 F.3d 72, 82-3 (2d Cir. 1999). The standard for directing a remand for calculation of benefits is met when the record persuasively demonstrates the claimant's disability, Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980), and where there is no reason to conclude that the additional evidence might support the

-33-

Commissioner's claim that the claimant is not disabled, <u>Butts v. Barnhart</u>, 388 F.3d 377, 385-86 (2d Cir.2004).

As discussed above, the ALJ erred by failing to include all of Plaintiff's anxiety-based impairments in his step two severity determination, which ultimately affected the remainder of the analysis. Furthermore, Defendant has failed to explain satisfactorily why the opinions of Plaintiff's treating psychiatrist, Dr. Yu, were not afforded controlling weight by the ALJ, who unjustifiably gave controlling weight to the internally inconsistent and vague opinion of the consultative psychologist. Substantial evidence exists in the record to warrant giving deference to the opinions of Plaintiff's treating psychiatrist, and when that deference is accorded, a finding of disability is compelled. <u>See</u> <u>Spielberg v. Barnhart</u>, 367 F. Supp.2d 276, 283 (E.D.N.Y. 2005) ("[H]ad the ALJ given more weight to the treating sources, he would have found plaintiff disabled. . . ."). In the present case, further administrative proceedings would serve no purpose. Accordingly, remand for the calculation of benefits is warranted. <u>See</u> <u>Parker v. Harris</u>, 626 F.2d 225, 235 (2d Cir. 1980).

## VIII. Conclusion

For the foregoing reasons, Defendant's motion for judgment on the pleadings (Dkt #5) is denied, and Plaintiff's motion for judgment on the pleadings (Dkt #7) is granted. The Commissioner's

decision is reversed, and the matter is remanded for calculation and payment of benefits.

**SO ORDERED**.

S/Michael A. Telesca

_____
HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:     May 8, 2014
           Rochester, New York